May it please the Court, I'm Kerry Sandman on behalf of Mr. Stokley. I'll try to reserve five minutes if I can for a rebuttal. Okay, can you speak just a little bit louder? It's hard in this courtroom to hear so much. Sorry, I'll speak up. In this capital case, the Court must address two primary questions in connection with the claim which the District Court certified for this appeal. The first question asks whether the petitioner has presented a colorable claim of ineffective assistance of counsel at sentencing. In answering this question, the Court applies the ordinary test the Supreme Court and this circuit have established for determining whether a colorable claim has been alleged, and that is whether the petitioner has alleged facts which, if proved, will demonstrate the violation of his or her federal rights. Or, as stated by this Court recently in West v. Ryan, the question is whether the petitioner has raised factual disputes that, if decided in his favor, would present a colorable claim of ineffective assistance of counsel. The second question assumes the petitioner has made the showing of colorable claim and asks if the petitioner should be entitled to a hearing despite the provisions contained in section 2254e2 of the AEDPA. The District Court only addressed the first question without reaching the 2254e2 issue and found the petitioner had failed to demonstrate a colorable claim of ineffective assistance of counsel under either the deficiency prong or prejudice prong of Strickland. Let me ask you this. If, if, if, just assume for a moment. I want to talk about AEDPA for just a minute. Assume for a moment that there's a colorable claim. That would mean we would have to get to, unlike the District Court, what the District Court did, we would have to get to the AEDPA claim, right? You would have to decide whether, despite the provisions of 2254e2, I would be entitled to a hearing. Yes, you would. So tell me why he, there was diligence in seeking a hearing before the Arizona courts. Well, Mr. Stokely's post-conviction lawyer was not diligent. And in the ordinary case, and I would submit this is not an ordinary case, but in the ordinary case, if a post-conviction lawyer is lacking in diligence in presenting the factual basis of the claim, that would bar, in this case, it would bar Mr. Stokely from developing the facts in support of his claim in the Federal courts. Why, normally that wouldn't be the case. So tell us, what is the precise legal hook you have here that gets you over the hurdle of, in effect, saying that counsel was ineffective on appeal in the post-conviction proceeding? Well, of course, I'm not. I know you're not saying that, but that's kind of the implication. Well, certainly there was a lack of diligence, but there was something more than that. And I think what happened in the State court post-conviction proceedings in Arizona was not just a lack of diligence, but a lawyer who was actively opposing their client's interests in the proceedings. And this Court has said, and I think clearly that that was Ms. Leavitt. Once Ms. Leavitt was discharged, initially by the trial judge, a bar complaint was filed against her. She became consumed at that point with protecting her own interest. She had to respond to a bar complaint. They charged her with the ---- I mean, it is a little odd. I mean, she did ---- in her reply or in her ---- but at some point along the way, she comments that ---- was it Ms. Ryan? Well, Ms. Ryan was the substitute counsel.  But Ms. Leavitt says that Ms. Ryan ---- the Court should have left Ms. Ryan in as counsel. Well, she does. I mean, she ---- Right. It was a little odd. I thought that ---- One thing I would credit Ms. Leavitt with doing is, number one, moving to withdraw. Number two, when the Court attempted or sought to reappoint her, she said, wait a minute. You know, you shouldn't do that. You should leave Ms. Ryan there. You should leave Ms. Leavitt in. Right. I thought that was kind of an interesting comment on her part. Now, you know, this Court, on somewhat different facts, in the Mormon case and in the Manning case, has said, look, we recognize there isn't a claim of ineffective assistance of post-conviction counsel. But if the post-conviction lawyer is acting adverse to their client's interest because of a conflict of interest, that would be cause. And it would be a ---- you know, that would permit us to say, okay, we're not going to hold a habeas petitioner in State court responsible for the acts of their lawyer if the lawyer is acting adverse to their interest. And, you know, I think Justice Alito ---- Those cases, and I appreciate your analogy, those conflict of interest cases are these multiple conflicting interests which are a typical conflict of interest. Here, you're almost suggesting an abdication rather than a conflict. Well, I think that it's both. I think clearly Ms. Leavitt had a conflict of interest. Her interest was to protect herself, but she went further. It's one thing for a lawyer to protect herself. She went beyond that and then attacked, you know, maritable claims that Mr. Stokely wanted to present in the case. She did that on the record. Although in the end, this claim was presented and they asked for an evidentiary hearing, correct? Well, she, without any real basis at all in the proceedings, had attacked really the one maritable claim that this entire case presents. She attacked that as being frivolous. And, you know, having gone on the record in the State court and called the one maritable claim in this entire case frivolous, she did what we would expect. She really did nothing. I just have one last question on this particular issue. So I just want to make sure I understand Arizona law, but was there anything she should have done with respect to asking for a hearing that she didn't do? Well, what a question. I mean, the post-conviction proceedings in Arizona do allow a Petitioner to request a hearing. That was done here. Right. Was there something more she should have done under Arizona law other than just asking for a hearing? I think that a diligent lawyer would have attempted to further the claim somewhat further by asking for funding to hire experts to do more. Didn't she ask? She didn't do that. She just asked for a hearing. And the Court looked at it and said, well, why? You haven't suggested that there's any you haven't presented us with any colorable basis for having a hearing. I think what a diligent lawyer would have done would have asked for funding for experts and psychiatrists to investigate the claim as we did in the district court proceedings. If there's not really a conflict as viewed under Arizona law, would we have to analyze this as being some external circumstance in order to overcome the diligence part? And that's really what I mean, that's the framework that Manning and Moorman ask us to apply. And I think you would and I think you could. And I think that what Justice Alito said in a recurring opinion recently in Holland v. Florida really applies here, because the question in Holland, although it was a statute of limitations question, the lawyer blew the statute. And there are cases where the U.S. Supreme Court has said, well, if the lawyer is just negligent and blows the statute, we don't care. That's the petitioner's problem. But in Holland, the lawyer's acts were so outrageous and beyond negligent, the lawyer was really acting adverse to the client's interest. And that's – I think that's what you have here. That's kind of what you're arguing here. I'm sorry? That's kind of what you're arguing here. That's right. And Justice Alito in his concurring opinion said that an attorney who is not operating as the client's agent and acts in a manner completely adverse to the client's interest should not be charged with the attorney's misdeeds. And I think that that's what happened here. Ms. Levitt did nothing on behalf of Mr. Stokely. Well, she filed a supplemental petition and then proceeded to attack all the grounds in the supplemental petition. Right. And I think that that we can say that the State courts are allowed to operate in that fashion, but they shouldn't be allowed then. And remember here, it was the Attorney General's office that urged the reappointment of Ms. Levitt opposed Ms. Ryan. What was the grounds that the Attorney General offered? I'm sorry? What were the grounds that the Attorney General offered? Well, they said the case should be – it's over. The case is over. You know, the Court had already really decided the underlying initial petition, and the Court said, well, why are you appointing Ms. Ryan to add all these new claims? We should be done. And, you know, as we know, the Arizona courts retained discretion not to close a case at that time. But the claims can be attacked without urging that the attorney be replaced. The State can say the claims are no good without saying, and by the way, take the attorney off the case who's making them. That's true. The State could do that. The problem here is that the defendant's own lawyer attacked the claims. He did, which I think is very important. He communicated both to the State court, the trial court, and the Arizona Supreme Court. I think in the E.R., I think we have at least three to four different occasions when Mr. Stokely said, I would like to have a fair forum where I can present my claims. And going back to Holland again, Justice Alito thought that was also a significant fact. When you have a lawyer acting adverse to the client's interest and the client is attempting to alert the courts, the State courts, that he actually needs help, legal help in presenting his claims. Justice Alito thought that the combination of a client trying, but the lawyer acting adverse to the client's interest would be enough to say, we're not going to bind that type of Petitioner. Yes. Kennedy. Mr. Sandman, you agree that evidentiary hearings, which is what you're seeking here, would not be required if taking everything that you set forth in your new affidavits is true, applying somewhat of a summary judgment prism to it. They are insufficient as a matter of law to establish ineffective assistance of counsel. So could you please address for me why you think that the trial counsel who relied and had Dr. Hoffman's neuropsychological examination, Dr. Barber's neurological examination, Dr. Morris's first psychological examination, Dr. Morris's recommendation that a neuropsychological testing or a neurologist be employed. Dr. Mehron, a board-certified neurologist, examining Dr. Morris, then examining what Dr. Mehron had found. What about that string of trial preparation matters? Do you find to be ineffective assistance of counsel? Let me try to address those items, Judge. First of all, the report from Dr. Hoffman. Dr. Hoffman. Mr. Stokely visited Dr. Hoffman about a month before the offense because he felt that he had some impairments, neurological impairments. Dr. Hoffman determined, believed from the testing he did that Mr. Stokely did not have impairments in his initial report. But interestingly, a week or two after the offense was made known, Dr. Hoffman issued a supplemental report. And in it he said, you know, I still think organic impairments need to be ruled out. So he hedged. And that was a flag for the lawyer to say, well, wait a minute, you know, maybe Dr. Hoffman said one thing in his initial report, his second report he says, we need to examine further. So that's Dr. Hoffman. Dr. Barber. We know that Mr. Stokely visits with Dr. Barber at least once, perhaps twice. And we know that Dr. Barber has administered a MMPI to Mr. Stokely, which is the personality inventory. But what we also know is that in February of 1992, which is just a few weeks before the trial, Dr. Morris issued his final report. And in it he said, we still have not addressed the issue of Mr. Stokely's possible organic impairments. And he needs to still be, we need to either have a neurologist or a neuropsychologist complete some testing in order to pursue that issue further. That's not quite so. You're talking now about Dr. Marin? No, Dr. Morris. Morris. And he suggested that the issue had still not been completely. Let's be precise. Dr. Morris did not request that there be neuropsychological testing either by a neuropsychologist or a neurologist. What he said is an organic disorder should be, the possibility of an organic disorder should be addressed by a neuropsychologist and or neurologist experienced in these matters. He didn't use the word testing. No, I agree with that, Judge. Another would be a neurologist. I agree with that. And that's exactly what trial counsel did. He had a neuropsychologist do testing, Huffman. He had another neuropsychologist do testing, Barber. They hadn't identified any organic brain damage. He then, instead of having a third neuropsychologist, went to a neurologist. I don't fault him at all in that. He's not getting any organic brain damage out of the first two. And a neurologist, Mehron, finds brain damage, right? And he's doing exactly what his experts tell him he should do. Now, under the Vasquez case in this district, I mean in this circuit, can you tell me what was deficient about that from the point of view of trial counsel? Well, first of all, we have alleged, and I believe should be entitled to prove at a hearing, that Dr. Barber did not complete his testing. Dr. Morris and Dr. Mehron testified, or at least in their federal court declarations, that the testing was not completed at the time of the sentencing hearing. We've alleged that that testing by Dr. Barber was not completed. And we have also alleged that at the time that Dr. Morris finished his report, he was saying, we still need to find out if this man has an organic impairment. And I say to this judge, I think there was nothing wrong at all or deficient in sending Mr. Stokely to Dr. Mehron to answer that question. Was he impaired? And it's what happens after that, because when Dr. Mehron issues his report and he testifies at the sentencing, he says that Mr. Stokely suffered a severe, very, he uses the word very, very in his testimony. He doesn't say very severe. He says very, very. And it seems to me that given the Arizona law or the Supreme Court cases, which have said if you can show causation, you know, if you can show that someone has an impairment, now, of course, with Dr. Mehron's report, we know he has an impairment that's significant. But the Arizona Supreme Court says that if you want to establish the statutory mitigator, you have to show that there's a link, a causative link between that impairment and the person's behavior at the time of the offense. And in this case, all of the experts, the four that are on record in this case, say that you can't link Mr. Stokely's very, very severe brain damage with his behavior at the time of the offense without really testing areas of his brain with neuropsych testing. And we're saying it wasn't done, and it should have been done at that point. But nobody said that in advance of trial to his trial counsel. Always said. The most direct statement was by Larry Morris, saying due to Mr. Stokely's history of head injuries, the possibility of an organic disorder should be addressed by a neuropsychologist and or neurologist experienced in these matters. And they did that. But tell me where trial counsel was tipped off. I will. That wasn't enough that he had to do neurological, neuropsychological testing, which had been done by Huffman and Barber. And here it is, John. I acknowledge this is a very fact-intensive case, which is why I think we're entitled to hearing. But to answer your question directly, Dr. Mehron has provided a declaration to the Federal District Court, which is in this record. And he says two things. He says if the law he says I can't remember for sure if the lawyers met with me before I testified at the sentencing hearing. Does that seem credible to you? And he says, and I agree with that. I think they did meet with him, because if you look at the questions that they asked him. Right. But what he says, if they met with me, I would have told them that they still needed to get this neuropsych testing done. And so I believe that I can prove at a hearing through Dr. Mehron that he told the lawyers, you need to still complete this neuropsychological testing. And I'm not saying I've proven it today. I'm saying that I have. Right. Of course, we don't even have any lawyer affidavits here, which is. I don't have the lawyer affidavits. But as I told the district court, the lawyers said, well, we don't remember, you know, anything about it. Here's where I kind of have some stumbling blocks on Dr. Mehron, is that I recognize that based on his second declaration, he credits the frontal lobe as different than the parietal lobe in terms of degree and the nature. But if you read his testimony, he says, you know, difficult time-controlling temper, consistent with these kind of head injuries, permanent post-concussion syndrome characterized with difficulty. I mean, he puts on the record actually a fairly significant link between a head injury and the kind of conduct that occurred here as a mitigating factor. So it seems to me a question more of degree. Now, I recognize from a medical standpoint, they would distinguish between the two kinds of brain injury. But as he's talking here, he's basically saying, you know, he's crediting a link between these two, and that's in front of the sentencing judge. Well. Why would this change or be substantially likely to change the outcome? You know, what he said, if you go, I read his testimony again the other day, and he couches all of his testimony about the effects of this type of injury. He says, this could affect somebody, somebody. Then when he's asked on cross-examination, he's asked, I think, page 65, 66 of the transcript. I forget the ER number. But he says, he's asked, what is the objective way of testing whether this, what he thought was a periatal injury, affected Mr. Stokely's behavior? And he said that he didn't know. And he said that he never did the testing to find out. And he said that you would need to do neuropsychological testing in order to test the various parts of Mr. Stokely's brain to find out how the injury affected his behavior. And so when you look at his testimony in Gross, where he talks about, if someone has a severe injury, I think most likely it would affect them, that's fine. I think he's Is the bottom line that we're trying to link his ability to understand the wrongfulness in terms of a mitigating factor? Well, it is, because Okay. So on that point, Morris. So Morris testifies on that point very directly without the kind of Here's the problem. He doesn't really put caveats in it. So what's wrong with that? Okay. Here's the problem. And remember, the whole framework for the analysis of the lawyer's conduct is they're trying to prove the G1 mitigator. The Arizona Supreme Court tells them if you want to prove it, a personality disorder will not establish the mitigator. So we know Dr. Morris is hinging all of his testimony on a personality disorder. The Arizona Supreme Court says, I think rightly so, if you want to blame everything you've done on a personality disorder, that's not good enough for us. We understand that. They need a significant impairment. And Dr. Morris could not provide it. In the end, Dr. Mehron did provide the significant impairment, but not the causal link. And so when the State of Arizona filed their sentencing memorandum in this case in the state court just prior to sentencing, they pointed out that the defense lawyers, and this is at ER 1725, they pointed out that Mr. Ahrens had failed to establish the G1 mitigating facts. They reiterated what I just said, which is that a personality disorder isn't sufficient. And so what we have here is the Arizona Supreme Court's willingness to recognize significant mitigation when there's this causal link to the offense. And, you know, I think when Dr. Mehron, and he should be entitled to it, we shouldn't be entitled to prove this at a hearing, says, you know, I told the lawyers they needed to have this testing done, I mean, that really, that was a tipping point. And we know now a lot of things we didn't know really at the sentencing. The same guy who says I don't think I talked to the lawyers, but it's clear from the record. He's saying 12 years later or whenever I interviewed him, and maybe it was more than that, you know, I don't remember. But if I, you know, yeah. I have another question that perhaps you can clear up for me. I read over Mr. ---- pardon me, Dr. Flynn's declaration and Dr. McKenzie's And it struck me that both of their declarations were not final on their own statements. Dr. McKenzie in January of 2000 says, my ultimate opinions in this case, therefore, await completion of Dr. Flynn's evaluation and findings. So he's saying I find what I find, but this isn't the final, final, because I'm awaiting Dr. Flynn. And then Dr. Flynn says something I think is rather unusual, paragraph 5 of his declaration. Although my evaluation is not entirely complete. Now, in April 2000, three months later, Dr. Flynn's declaration is, his examination is not complete, he says, although my evaluation is not entirely complete as I am awaiting receipt of additional relevant case history from Mr. Stokely's counsel. Right? So what I see in that is that neither of these two affiants have a final opinion as to whether the frontal brain damage caused the impulsive behavior, which was the crime. Well, I think that they did conclude that. But I also think, Judge, that they recognized that they may do some additional work. And I think we do. Did Dr. Flynn ever receive the relevant case history from Mr. Stokely's counsel as you, that he was talking about? And what was that relevant case history? Well, what I said in the district court in my merits memorandum is that we want to develop all of these claims. The district court said, you know, part of what we're trying to do is to develop the claims and then have a hearing. And what I told the district court in our merits memo was, as part of the development of the mental health evidence, that we did want at some point to have the opportunity to develop those claims further by expanding on the social history, that investigation that was done originally by state counsel. So, and we have not done. I mean, the Court has said we don't have a right to develop these claims further. It dismissed the habeas petition, finding that even if we proved everything we wanted to prove, we would still lose. So you have to go forward at that stage. Right. But we do want to reserve the remaining time for rebuttal. Yes. Thank you. May it please the Court. My name is Jonathan Bass, and I represent the Respondents of the State of Arizona in this case. I ask that this Court affirm the district court's denial of this claim, because even if Mr. Stokely could prove all of the facts that he's alleging, he would not be entitled to an evidentiary hearing because he can't prove a colorable claim of ineffective assistance of counsel. What element is missing to prove a colorable claim? Your Honor, he doesn't prove deficient. He doesn't have to prove his claim to us. He just has to. It's a threshold showing that he needs to make. That's right. And we've characterized it as a low threshold, you know. We're not supposed to try the case in making that determination. Well, he hasn't shown that his attorneys were deficient, and he certainly hasn't shown prejudice, even if they were deficient. In fact, he doesn't allege that he needs an evidentiary hearing, or he hasn't alleged perhaps until today that he needs an evidentiary hearing, even to develop the deficient performance prong of Strickland. There's nothing in the record that shows that these attorneys were deficient in their performance under the standards that were applicable in the early 90s in Arizona. They developed a plethora, a mountain of significant and relevant mitigation evidence, as has been pointed out. Are you suggesting that Mr. Sandman has failed to file an affidavit by an attorney who was practicing law at the time in 1991, who said he would have asked for neuropsychological testing, notwithstanding what Dr. Mehron, pardon me, what Dr. Morris recommended? That would be helpful. The absence of an affidavit like that, I think, is significant. But simply, as we talk about deficient performance, though, these attorneys did everything that they were required to do. At every stage where they began the case with a great deal of significant mitigation about Mr. Sandman. But they didn't discover the frontal lobe brain damage. No, they didn't discover that, Your Honor. But I submit that that's, one, they had no idea that they were, that they should have discovered it. Well, they had some pretty good information, though, prior to trial. It's pretty good information, yes, Your Honor. But still, it's unreasonably. Given the standards under Arizona law for this particular mitigating circumstance that they were pursuing, they knew what they had. That should have, any reasonable lawyer would have known that if they were going to really pursue that, they would have to meet the standard that Arizona Supreme Court has set. Right. But they were. And, you know, cite the, what is it, the personality disorder isn't going to cut it under Arizona law. It's pretty clear. Well, that's true, Your Honor. But that's what they had from Dr. Morris. I mean, they may have wanted to go further, but that's what they had from Dr. Morris. They had evidence of brain damage. Right. And what they were lacking was the link between that and their client's conduct, although they had some of that around the edges. Why wasn't that a red flag to say, okay, we have to see, we have to nail down whether we can make that link? Because that link will be our linchpin in the mitigating circumstances. Well, I think there's a couple of ways of looking at that. Number one is their experts need to tell them that. They, at every turn, did what their experts said needed to be done. They had, as has been noted, at the mitigation hearing, they had a psychologist, Dr. Morris, testify. They had a neurologist, Dr. Mehron. They had reports from another neurologist, Dr. Barber, and, or at least that report at MMPI-2 was incorporated into Dr. Morris's report. They had information from Dr. Hoffman, a psychologist. They went everywhere they were supposed to go to find mental health mitigating evidence. They had some significant problems here. One is that when Stokely was talking to Dr. Morris, he could not describe what he was doing the night of the offenses. In other words, he couldn't provide information for Dr. Morris to establish his state of mind. That has never changed. And the reports from Dr. McKenzie and Dr. Flynn and the follow-up reports from Dr. Morris and Mehron that are in the habeas materials, Stokely still provides no information. So even if neurological testing had been done beyond what Dr. Barber did or what Dr. Hoffman did, there's no way to know precisely what Stokely was thinking that night in terms of whether he was actively, well, let me, I'm getting ahead of myself. What I'm saying is if he's not going to provide that information, then all of their guesswork, frankly, as far as how he was influenced that night and how his proneness and tendency to act impulsively, whether that was in play, is going to be speculative because they don't know exactly what happened and Stokely hasn't told anyone who has examined him. But who he has told is the police. He confessed after the crime. And the Arizona Supreme Court opinion is replete with findings, as was the special verdict from the trial court, that this was not a crime that involved any sort of impulsive behavior. And so to some degree, even if we had a long line of psychiatrists and psychologists who were testifying that Stokely is prone to behave impulsively under certain circumstances, it doesn't really matter because he did not behave impulsively when he killed these two girls. So what you're saying is under 2254d-2, this is not an unreasonable finding of fact that he did not engage in impulsive behavior, so no matter how many doctors have testified to no matter how much brain damage, the determination by the last reasoned opinion of the state court was not unreasonable. That's right, Your Honor. But they didn't have any medical. They didn't have this medical connection between his brain damage and whether there was any causal connection. And they, in the court itself, said they give more credence to the claim of mental impairment than the state court did at sentencing, if I remember correctly. Well, I think you're right. But I think that, you know, it's interesting because lacking that testing, assuming it is lacking, didn't stop these experts from reaching the ultimate conclusion that he could not conform his conduct to the law. And I think we'd have a different case here if these experts said, you know, we'd like to reach that G1 finding. We'd like to be able to say that he couldn't conform his conduct to the law, but we don't have the neurological testing that we need to really be sure. They didn't say that. They apparently had enough. And there's never been an allegation here that Soakley's lawyers did not give his experts enough to reach that ultimate opinion. Now, could it have been made a little bit more credible with further neurological or neuropsychological testing? I don't think so. Because, again, you've got to look at the facts of the crime. He may academically be somebody who is prone to behave impulsively. And I think Dr. Morris brought that out well in his report and testimony that that's been a pattern in Soakley's life for years and years, well before the murder. He's somebody who has a difficult time adjusting to stressful circumstances, and he exacerbates that by drinking. That's not news. But on the night that he killed these two girls, he was not behaving impulsively. And that's why I think the state court was certainly correct in saying that. Can you draw that from what he told the police afterwards? That's right. We draw it from what he told the police afterwards, his recall, what he said, which is all consistent with the evidence. And just the facts themselves, how he killed these two girls, indicates that he was not behaving impulsively. He covered up the crime afterwards by throwing their bodies down a mine shaft. He burned their clothes, all these facts that the court's very familiar with. This is not somebody who's acting impulsively. This is somebody who's acting with premeditation. And the jury so found, and I submit, although we're not on that issue really, that that's why the counsel was quite wise in not really challenging premeditation with this kind of evidence during trial. Stokely premeditated these crimes, and he behaved that way. He was not acting impulsively. And Stokely, even if this went back to an evidentiary hearing, could never overcome certainly the prejudice prong of Strickland. And I submit can't overcome the deficient performance prong as well because he can't show that his attorneys were deficient in any way. If anything, conceivably, Dr. Mehron should have spoken up a little earlier, although I'd – that's not something we can lay at his attorney's feet and say that he was responsible for, for knowing that further testing was necessary. Dr. Mehron testified that Stokely could not conform his conduct to the law, and the trial court and by the Arizona Supreme Court, and nothing submitted by Dr. Mehron. Was that discounted by the trial court? It was – it was – it wasn't given a lot of weight. The Arizona Supreme Court gave his mental problems a little bit more mitigating weight, but again, the brick wall that Stokely keeps running into is this was not a crime that involved impulsivity. And if you take all of these reports from all of these psychologists and neurologists, it all really comes down to the same thing, whether it's borderline personality disorder or organic brain damage. What does that do? It causes Stokely to behave impulsively. It causes him to react. He's a reactive person, not a reflective person. Well, this crime proves otherwise, and that's really what we're looking at. He did not behave impulsively. Is the – are findings with respect to whether this was a crime of impulse, are those factual findings in the State court, or are those legal conclusions based on the facts? What do we do with that? I think they're factual findings. I think the – certainly the finding that he behaved with premeditation, that's a factual finding. That's not a challenge to this appeal. That's a factual finding that this Court must give great deference to. That's conclusive proof that he did not behave impulsively. And then certainly looking at simply the circumstances of the crime itself, as the Supreme Court lays out, as does the trial court. But the Supreme Court lays it out certainly under the categories of alcohol, the effects of alcohol abuse and his mental health problems and his head injuries and so on. All of this is looked at in great detail and ultimately, given some way, but discounted ultimately because it's simply – it's simply almost – almost irrelevant. I mean, it's interesting. It's – it's something to consider about Mr. Stokely, but it doesn't outweigh the significant aggravation in this case. And that's another issue that would prevent Mr. Stokely from ever succeeding in overcoming the prejudice prong of Strickland, is that the aggravation of this case was – was extremely strong. Just – could you just address for a moment the diligence requirement under AEDPA to get a hearing? You know, this Court – Or is that something you'd rather not press? I mean, it was kind of odd for the – for the – It's an unusual circumstance. It's very strange. I mean, for the whole – the whole scenario was, I thought, rather bizarre, from the actions of Ms. Leavitt to the role of the State Attorney General's office in objecting to, you know, what the Court was doing. And it was just very weird. Well, you've got a situation where Ms. Leavitt has – has presented a PCR petition. She has examined the case. She's raised the issues that she thinks are important. She attaches – I believe she attaches to the original PCR petitions and affidavits. And that's as far as she goes. She's a confident attorney. She looks at this case. She decides what issues to raise and raises those issues. She got a little defensive afterwards, didn't she? Well, she's defensive, certainly because Ms. Ryan had attacked her a great deal. The district court, as you know, went into this in some detail, examining it in the procedural order. But sure, Ms. Leavitt is going to be on the defensive somewhat to maintain her integrity and her professional standing. But ultimately, she files a supplemental petition, raises this claim, asks for a hearing, says she's going to provide evidence later. I contend that that indicates, as this Court said in Lopez, when you don't attach affidavits and evidence to support your – your petition, that you're not diligent. I don't think she was diligent in presenting this claim. But I – She says you shouldn't have – you should have left Ryan on as counsel. Well – I mean, what we have here is here's poor Mr. Stokely. You have a whole sideshow going on in his case, basically. And he's over here. I mean, he's the one suffering the consequences. He wants his claim presented. It's kind of hard to have an attorney who says, well, I don't really think you have that claim. Okay. Then you file with the Court. Here's the claim. Oh, and by the way, we'll put some evidence in at some point. And the Court's like – so, I mean, the real question is why – why shouldn't he be excused on the diligence factor? Because he couldn't have done any more. I mean, he's stuck with this attorney that the Court sticks him with, but she doesn't believe in his claim, basically. Well – I mean, it doesn't quite fit in any of our prior cases, because most attorneys don't perform in that manner. Well, that may be. I can see that it's certainly an unusual set of facts. But, you know, the attorney is ultimately the one who's going to make these decisions. And as the district court said in its procedural order, if the Court were to accept Petitioner's argument, then any PCR proceeding in which a Petitioner challenged the competency of or sufficiency of communication with PCR counsel would be suspect. Counsel ultimately is going to make the decision what claims to raise. And in this case, sure, Ms. Leavitt initially decided not to raise the claim. And, frankly, looking at the evidence that's been presented in habeas and looking how difficult such a claim would have been to raise, I'm not sure that she was wrong there. I – I – Just imagine if she'd had Mr. Sandman at that, you know, in the PCPC. It would have looked quite a bit different. It probably would have looked quite a bit different. But we still, I think, it would have – Mr. Sandman would still have to contest or contend with the – with the issues that I've talked about, the lack of impulsivity in the commission of a crime and these other matters. But Ms. Leavitt did submit a supplemental petition, and she did raise the claim. She ultimately got a ruling on the merits. I'm not going to concede that there's a lack of diligence here because I – or that there – that there – that there – I'm not going to say that there was diligence. There was not diligence. But, you know, honestly, Your Honors, the strength of my case rests on the fact that the – Right. Your best argument is at the end. I mean, it's the prejudice. Your best argument is, you know, no matter what they have to offer here. Right. If this Court affirmed just as the district court did, I would be quite pleased. But I think that that's the prong that's going to defeat Mr. Stubbley every time, the prejudice prong. But there's certainly a lack of – or a lack of evidence showing deficient performance, and I contend there is a lack of diligence here. I'm presenting this at the State court. Can I ask you just one sort of record kind of question? Yes. The comments about, I guess it was Dr. Barber? Barber? We know he was apparently retained. Right. He did an MMPI. Right. But apparently he – the record seems to reflect that he never finished his full examination. Is that correct? It's hard to say. I mean, he – I mean, the State must have done some investigation on its own, but it's not in the record. I mean, there's nothing in the record that – That's right. That's the problem. But I'm just – in this record, there is nothing other than – all we know is that Dr. Barber saw him, saw Stokely, maybe once – at least once, maybe twice. He needed an MMPI, and he provided that test – those test results. I forget to which doctor, but he – Morris reports, though. Morris reports. Other than that, Barber drops out of the picture. Is that correct? That seems to be the case. I don't know why exactly. I mean, maybe defense counsel was expecting Dr. Morris to provide some guidance as far as what to do with Dr. Barber's results or something, because he did incorporate them. And perhaps that's what led Dr. Morris then to advise counsel to seek further testing by – or consultation by a neuropsychologist and or a neurologist, which was done. But I agree with you, Your Honor. I'm not sure this is the case.  I'm not sure where Dr. Barber seems to disappear from the case after that. Okay. If there are no further questions, I ask this Court to refer them. Thank you. Mr. Salmon, I think you have a couple of minutes. I'd like to make a few very quick points. Number one, the standard in this, never been in this circuit, at least not for a long time, the standard is not that you have to rely on what your experts tell you. The Caro case says the lawyers have to ask certain questions. In that case, in Caro, the lawyers knew that the man had been bombarded with pesticides, and this Court said, you know, the lawyer should have asked, how do you think that affected him? They should have asked their own experts. How do you think those pesticides affected Mr. Caro? And what I'm saying is when they got Dr. Mehron's report, the lawyers should have said to Dr. Morris, how do you think that affected his behavior? Dr. Mehron, how do you think that affected his behavior? It's the lawyers have a duty when they have a tantalizing bit of evidence that they know could be crucial to the man's case. They have to ask. Secondly, you know, the lawyers did do some things in this case. This is not a case where they did nothing. But the Rapilla case, Justice Breyer said, this is not a case where the lawyers simply ignored their obligation to find mitigating evidence. They spoke to a lot of people. They talked to mental health workers. In Caro's case, prior to sentencing, the lawyers had sent him to two psychiatrists and a psychologist. In the Bean case, the lawyers called nine witnesses and had him examined. So I think that the focus, it's a fact-specific focus on each case. Finally, I think that it's fair to say that every time a petitioner can establish the G1 mitigator, he can establish a significant impairment that caused his behavior. The Arizona Supreme Court has, in many cases now, all of them where the person was convicted of a premeditated murder, they have reduced the case. So in Stewart and Brookhover and Morrow and Trostle, they're all premeditated murders. But when they have that evidence of G1, they have reduced to life. So I think that it's fair to say that at least at this stage, even before an evidentiary hearing, that we can say that there's a reasonable probability for a different outcome. And I thank you. Thank you. I would like to thank both of you for your arguments and also for your careful and extensive briefing on this case. Stokely v. Ryan has now submitted an order.
judges: McKeown, Paez, Bea